# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED ROAD TOWING, INC., a Delaware corporation | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| INCIDENTCLEAR LLC, et al. | ) ) | |
| Defendants/Petitioners | ) ) | 14 C 10191 |
| v. | ) ) | |
| MEDLEY CAPITAL CORPORATION, a Delaware corporation, UNITED ROAD TOWING, INC., a Delaware corporation, and URT UNITED ROAD TOWING, INC., a Delaware corporation | ) ) ) ) ) ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant/Petitioner IncidentClear's motion seeking summary judgment against Plaintiff United Road Towing, Inc. ("URT"), Medley Capital Corporation ("Medley"), and URT United Road Towing, Inc. ("URT United") (collectively, "Respondents"). For the following reasons, IncidentClear's motion is denied.

1

# BACKGROUND

## I.     Local Rule 56.1

Northern District of Illinois Local Rule 56.1 requires each party on a summary judgment motion to submit a Statement of Material Facts in support of its respective position ("Rule 56.1 Statements").  These statements are meant to streamline the adjudicative process by identifying the material facts and presenting them in a concise and easy-to-follow manner.  Rule 56.1 Statements should contain only factual allegations and avoid legal arguments or conclusory statements.

The non-moving party must respond to the movant's Rule 56.1 Statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits.  N.D. Ill. R. 56.1(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant must support their contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.

The non-moving party may include in its Rule 56.1 Statement a set of additional facts that require the denial of summary judgment.  N.D. Ill. R. 56.1(b)(3)(C).  If additional material facts are submitted by the opposing party, the moving party may submit a reply to those facts.  N.D. Ill. R. 56.1(a).  All material facts set forth in a non-moving party's Rule 56.1 Statement will be deemed admitted unless controverted by the statement of the moving party.  *Id*.  Here, Respondents submitted a statement of additional facts in its Rule 56.1 Statement.  IncidentClear

submitted no response whatsoever to Respondents' Rule 56.1 Statement; therefore, all facts put forth by Respondents are deemed admitted.

"It is the function of the Court…to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement." *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014). The Court has reviewed the parties' Rule 56.1 Statements accordingly and now turns to the relevant facts. The following facts taken from the record are undisputed, except where otherwise noted.

## II. Facts

### A. Background

Plaintiff URT initiated this action against Defendants IncidentClear, Ryan Davids ("Davids") and George Bergeron ("Bergeron"), (collectively, "Defendants") alleging that Davids and Bergeron, previous employees of URT who own IncidentClear, used confidential and proprietary information they learned while at URT to bid on contracts with the Massachusetts Department of Transportation ("MassDOT") in violation of their obligations under their employment contracts. Defendants' misconduct harmed URT's business and assets. URT alleged that it was runner-up in bidding for the MassDOT contracts and, but for IncidentClear's misconduct, would have been awarded the contracts.

Due to financial issues as a result of the irreparable harm caused by IncidentClear, URT believed its only option was to allow IncidentClear to continue the existing contract cycle with MassDOT and defer the reparation process and prohibit IncidentClear from participating in bidding on MassDOT contracts for the next cycle. Because Defendants did not have sufficient funds to remedy their damage to URT, the reparation payments they made were a fraction of the damage they caused URT. That, in addition to expenses of the litigation, tarnished good will, and business interruption, strained URT's operations.

After months of litigation, the parties agreed on a Consent Decree as an attempt to remedy the harm caused by Defendants. The Consent Decree, in general terms, enjoins Defendants from competing with URT and related entities in various ways for a period of five years. Most significantly to the instant motion, the Consent Decree enjoins Defendants from performing services for or bidding on MassDOT contracts for certain areas.

The Court entered the Consent Decree on August 12, 2015. Provision 6 of the Consent Decree states, in relevant part:

> Except as otherwise provided herein, Defendants Davids, Bergeron, and IncidentClear, and its members and officers, agents, employees, successors, assigns and nonparties []…(the "Restricted Group"), are enjoined from directly or indirectly, for a period of five (5) years from the date of entry of this Consent Decree (the "Restricted Period")…
>
> (b) engaging in any work with or for, or performing any services for, MassDOT in connection with or relating to the Business and from bidding on or otherwise seeking or making any effort or being involved

in any activity that has the intent, purpose, or effect of expanding on IncidentClear's existing MassDOT Contracts with IncidentClear (the "Existing IC MassDOT Contracts"…) for Areas 1, 2, 4, 5, & 6, and further that if offered any existing extensions, or enlargements of those contracts or new contracts with MassDOT or its successors or assigns, except as provided herein, Defendants will not accept nor contract with MassDOT for such work.

*  *  *

Notwithstanding the foregoing, in the event URT sells both Export and Pat's Towing, Inc. to an outside party unrelated to the United Companies during the Restricted Period (the "Contingent Sale"), then the restrictions above with respect to Defendants and the Restricted Group performing work for or bidding on MassDOT work covered by the Existing [IncidentClear] MassDOT Contracts after a Contingent Sale shall no longer apply on and after the effective date of such a Contingent Sale for the remaining part of the Restricted Period; provided, however, that this exception shall not affect whatsoever the other restrictions and agreements herein, including but not limited to the Defendants' obligations to continue to make payments to URT…

The Consent Decree defines the "United Companies" as "URT, its subsidiaries, affiliates, and their successors or assigns, including its wholly-owned subsidiary [Export]." "Business" includes the business of "providing, or assisting in providing, for the following services: towing, vehicle storage, abandoned or other vehicle auction services, freeway service patrol, road side assistance, vehicle impound management, dispatching, HOV Barrier and/or towing work, and specifically including and without limitation any businesses run under the VMS brand."

## B. Bankruptcy & Sale

About a year and a half after the Consent Decree, on February 6, 2017, URT filed Chapter 11 Bankruptcy in the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court"). URT's parent company, URT Holdings, Inc. ("URT Holdings"), and all of URT's subsidiaries also filed for bankruptcy on the same date. URT's twenty-seven subsidiaries included, among others, Export and Pat's. URT Holdings, URT, and URT's subsidiaries are collectively referred to as the "Debtors."

The Debtors requested the Bankruptcy Court to consolidate the Chapter 11 cases for procedural purposes only and to jointly administer them. At the time of the bankruptcy filing, the Debtors continued to operate their businesses as debtors-in-possession under the Bankruptcy Code. The Debtors employed approximately 725 employees and independent contractors. Of those 725 employees, approximately 93 were salaried, 345 were paid hourly, 232 were paid commissions, and 55 were employed as independent contractors paid on a commission basis. The Debtors' primary objective in commencing the Chapter 11 cases was to pursue a prompt sale of their assets in order to maximize value for stakeholders, preserve jobs, minimize supply disruptions for the Debtors' customers and ensure an uninterrupted supply chain for the Debtors' vendors.

Four days after the bankruptcy filing, the Debtors moved the Bankruptcy Court for approval to sell substantially all their assets in an auction sale. The Bankruptcy Court granted the Debtors' motion and entered an order setting forth the bidding procedures for an auction sale. The Debtors hired SSG Advisors, LLC ("SSG"), an investment banking firm, to assist in and market the sale of the assets. SSG solicited

221 potential buyers. Pursuant to the Bidding Procedures, the Debtors received multiple bids and held an auction on April 10, 2017, to determine which of two qualifying bids they would select: (1) Transom Towing Holdings, LLC or (2) Medley. The auction allowed for open discussion and clarification of the bids, with a final irrevocable bid made by each party. Because Medley was involved in the sale process as a bidder, it was not a "consulting party," *i.e.*, "counsel and financial advisory to any official committee appointed in these cases representing parties with an interest in the assets" to the Debtors. Thus, a "Chinese Wall" was constructed between Medley on the one hand, and the Debtors, the Debtors' boards' of directors, and the consulting parties on the other hand. The Debtors ultimately selected Medley as the successful bidder.

The Debtors sought an order from the Bankruptcy Court approving the sale to Medley pursuant to an Asset Purchase Agreement ("APA"). In support of the proposed sale order, the Debtors submitted a declaration from SSG managing director, Mark E. Chesen. In his declaration, Chesen stated that "[t]he Sale effectuates the necessary changes allowing for the Debtors' business to continue operating as a going concern under the ownership of Medley…" Chesen also declared that the APA was "negotiated, proposed and entered into by the Debtors and Medley without collusion, in good faith and from arm's-length bargaining positions and is substantively and procedurally fair to all parties." He further stated that "the Debtors' board of directors includes no members who are affiliated with Medley." Respondents note, however,

that Chesen also averred that "while Medley is an insider, Medley in no way used its insider status to affect the marketing process, the Auction, or any other aspect of the process leading to the Sale."

On April 13, 2017, the Bankruptcy Court entered a Sale Order, approving the APA between the Debtors and Medley.  The Bankruptcy Court found that (1) the transactions under the APA did not amount to a consolidation, merger, or de facto merger of Medley and the Debtors; (2) there was no substantial continuity between Medley and the Debtors; (3) there was no continuity of enterprise between the Debtors and Medley; (4) Medley was not a mere continuation of the Debtors or their estates; and (5) Medley was not a successor or assignee of the Debtors or their estates for any purpose, including but not limited to under any federal, state or local statute or common law. During the Sale Hearing, the Bankruptcy Court found the sale "a proper exercise of the Debtors' business judgment, that the Debtors lack capital to continue as a going concern; therefore, necessitating the sale."  It further stated that the "[s]ale must be approved and consummated promptly in order to preserve the viability of the Debtors' business as a going concern and to maximize the value of the Debtors' estates."  In finding that the sale was made in good faith, the Bankruptcy Court "recognize[d] that [Medley] is a related party" but found that there was "no evidence of a lack of good faith."

IncidentClear claims that neither the APA nor the Sale Order made specific mention of the assignment of the Consent Decree.  Instead, the APA generally states

that included in the assets purchased from the Debtors were "all rights under judgments, stipulations, and consent decrees relating to the Business." Respondents claim that all parties knew that the only consent decree of the Debtors at the time of the APA, Sale Order, and Closing Date of the APA was the Consent Decree.

### C. Medley

Medley is a non-diversified closed end management investment company incorporated in Delaware that has elected to be treated and is regulated as a business development company under the Investment Company Act of 1940. Medley is a public company traded on the New York Stock exchange. Medley describes its business objective as follows:

> Our investment objective is to generate current income and capital appreciation by lending directly to privately held middle market companies, primarily through directly originated transactions to help these companies expand their business, refinance and make acquisitions. Our investment portfolio generally consists of senior secured first lien term loans and senior secured second lien term loans. In connection with many of our investments, we receive warrants or other equity participation features which we believe will increase the total investment returns.

Medley's 2016 Form 10-K lists URT as a "controlled investment" and the Bankruptcy Court was advised and aware that Medley was a majority and controlling shareholder, insider, and related party of the Debtors.

The Debtors did not list Medley as part of the Debtors' corporate structure. In their Declaration to the Bankruptcy Court, the Debtors described Medley as pre-bankruptcy petition second-lien lender to the Debtors. According to

IncidentClear, Medley loaned $19,365,000 to the Debtors pursuant to a Second Lien Credit Agreement dated August 21, 2014. Respondents disputed this fact to the extent the Debtors attempted to describe their equity structure and governance. Respondents claim that the Debtors were describing its "prepetition capital structure" instead. Furthermore, Respondents cite to the Debtors' motion before the Bankruptcy Court in which Debtors stated that Medley was "a significant equity holder of the Debtors." URT Holdings and each subsidiary of URT (save one) guaranteed all of the indebtedness under the Second Lien Credit Agreement, including its obligations to Medley. Medley and the Debtors' first lien lender, Wells Fargo Bank, were parties to an Intercreditor Agreement, which governed the rights between them as lenders to the Debtors.

Medley owned Series A and Series C preferred stock as well as Class B common shares in URT Holdings. Under the Fourth Amended and Restated Certificate of Incorporation of URT Holdings, holders of preferred stock had no voting rights, and holders of Class B common stock were not permitted to vote unless they exercised an election. Through Medley's ownership of 94.07% of Series C preferred stock of URT Holdings, which owned 100% of the equity of URT and all of its subsidiaries, Medley controlled the Preferred Series C Approval Rights ("Approval Rights"), requiring Medley's approval for every material action taken by URT Holdings and its subsidiaries, other than the sale process in the bankruptcy. The Approval Rights include, among others, the annual operating budget; material

deviations from the annual operating budget; loans; encumbrances; entering into or amending any employment agreement or material contract; any hiring, termination or replacement, or substantial change of corporate officers; and filing of the Debtors' bankruptcies.

IncidentClear claims that Medley never exercised any of its contingent voting rights. Respondents, however, insist that Medley exercised its Class C Shareholder Approval Rights to, among other things, consent to the bankruptcy filing. While Medley did not exercise its right to elect a director to any of the Debtors' boards of directors, it had the right to issue notice that it would vote its 65.8% of URT Holdings common shares or elect a director. IncidentClear claims that, had Medley exercised its voting election, it would have voted together with the URT Holdings Class A common stockholders. Respondents object to this factual statement, explaining that the Class C preferred shareholders have approval rights as to all material corporate decisions and actions and had Medley exercised its Class B common share right, it would have the right to vote 65.7% of all common shares' voting rights. The URT Holdings Class A common stock was over 70 percent owned by Milestone Partners L.P. and Milestone Partners L.P. 2.

Medley formed a new corporation on April 12, 2017, one day before the Bankruptcy Court entered the Sale Order. On April 27, 2016, Medley entered into an Omnibus Assignment and Assumption Agreement ("Omnibus Agreement"), which included an assignment of Medley's rights in the Consent Decree to its subsidiary

URT United.  The parties disagree as to whether Medley purchased the assets of the Debtors.  IncidentClear states that the assets of Pat's Towing and Export were not purchased by Medley, but by two corporations formed on April 19, 2017: URT Pat's Towing, Inc. and URT Export Enterprises, Inc.  Respondents object, stating that Medley was the only Purchaser under the APA of the Debtors' acquired assets and assumed liabilities and businesses, including those of Pat's Towing and Export.  They explain that Medley exercised its right under the APA to enter other parties and Medley's affiliates into the Omnibus Agreement.  That did not create a sale of any of the Debtors' assets to any other person other than Medley.

IncidentClear also insists that URT did not assign the Consent Decree to Medley.  Instead, they explain, URT assigned the Consent Decree to URT United, which was newly formed on April 17, 2017.  Respondents, however, explain that the Debtors sold all acquired assets under the APA, including the Consent Decree, to Medley, which then exercised its right as the purchaser to assign the assets to its affiliates, including its subsidiary URT United.  The Omnibus Agreement did not include Medley's independent right to enforce the restrictions in the Consent Decree against IncidentClear and parties acting in concert with them, as a designated third party beneficiary from its status as an affiliate of URT within the definition of "United Companies" in Section 6(a) of the Consent Decree.

On May 2, 2017, the parties completed the sale ("Closing") to Medley by URT, URT Holdings, and their subsidiaries conveying the APA acquired assets, assumed

liabilities, and their businesses as going concerns to Medley's affiliates and designated subsidiaries. At the Closing, with few exceptions, each of the Debtors' acquired assets, assumed liabilities, and businesses were transferred to an affiliate/designated subsidiary with near identical names corresponding to the names of the Debtors (*e.g.*, Export transferred its assets and assumed liabilities to URT Export, Pat's Towing transferred its assets and assumed liabilities to URT Pat's Towing, and so on).

As of the Closing, Medley owned 65.8% of the common shares and over 80% of all equity of URT Holdings, which in turn owned 100% of URT, which in turn owned 100% of all the remaining Debtors. At the Closing, URT United was assigned and assumed all of the acquired assets and assumed liabilities of URT, including the Consent Decree. The result of the Sale was that the corporate structures, operations, and businesses of the Debtors' before the Closing mirrored those of Medley's designated subsidiaries and affiliates after the Closing, and they continued Debtors' operations and businesses as going concerns after the Closing.

On May 8, 2017, the Debtors moved to dismiss their bankruptcy cases because the Debtors no longer conducted any business, had no remaining assets, and there was no business to reorganize. One year later, IncidentClear brought a Petition seeking a declaration from the Court as to whether it has the right to bid on the upcoming MassDOT contracts. It now seeks summary judgment, arguing that the Debtors' bankruptcy filing and subsequent sale of assets (1) amounts to "changed circumstances" that subvert the purpose of the Consent Decree, or, in the alternative,

(2) triggered the Contingent Sale provision of the Consent Decree, which warrants dissolution of the bidding injunction.

## LEGAL STANDARD

In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the "record as a whole." *Morgan v. Harris Trust & Sav. Bank of Chi.*, 867 F.2d 1023, 1026 (7th Cir. 1989).

## DISCUSSION

IncidentClear seeks summary judgment declaring that the injunction in the Consent Decree, which prevents IncidentClear from bidding on the upcoming renewal of the MassDOT contracts, is dissolved. IncidentClear brings two main arguments: (1) changed circumstances, *i.e.*, the Debtors' bankruptcy filing and sale, subvert the purpose of the Consent Decree, which was meant to protect the "United Companies;" or, alternatively, (2) Medley's purchase of the Debtors' assets triggered the "Contingent Sale" provision of the Consent Decree and negated the MassDOT injunction. Furthermore, IncidentClear argues that judicial and collateral estoppel bar

14

Respondents from claiming that they are related to the United Companies or successors or assignees to them.

## I. Changed Circumstances

A judicially approved consent decree is essentially a contract. *United States v. City of Northlake, Ill.*, 942 F.2d 1164, 1167 (7th Cir. 1991). It is a final judgment that may be reopened only to the extent that equity requires. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 370 (1992). A party seeking modification of a consent decree "bears the burden of establishing that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." *Id*. at 369.

The Court has discretion to grant a party relief from a judgment "if applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). A consent decree may be deemed inequitable where (1) changed factual conditions make compliance with the decree substantially more onerous; (2) the consent decree proves to be unworkable because of unforeseen obstacles; or (3) enforcement of the decree without modification would be detrimental to the public interest. *Rufo*, 502 U.S. at 367, 383–84.

IncidentClear claims that the Debtors' bankruptcy sale of all their assets, including the assets of Export and Pat's Towing, and ceasing to operate subverts the purpose of the Consent Decree. It argues that because the corporations are no longer operating, there can be no protectable interest and there is no purpose in continuing

the injunction for entities that were not named in the Consent Decree or in legal existence at the time. It states that the United Companies "died at the moment the APA was approved by the Bankruptcy Court." The new entities formed around the time of the bankruptcy sale had no relationships with MassDOT, and thus, IncidentClear argues, do not have to "recover" from any damage that IncidentClear caused in the past.

Respondents deny that there are any "changed circumstances" that require modification of the Consent Decree: "Compliance is no more onerous nor is it unworkable, and both federal and Illinois public policy were furthered by the sale to Medley, including of the Consent Decree." Respondents insist that the United Companies' legitimate business interests did not cease to exist; they were purchased by Medley, assigned to its affiliates, and remain essential to Medley's and its affiliates' businesses. Furthermore, Respondents explain that the purpose of the Consent Decree was to address and repair the harm IncidentClear and related parties caused to URT and the United Companies by using URT's trade secrets and engaging in anti-competitive conduct to obtain contracts with MassDOT. The bidding injunction thus prohibits IncidentClear from furthering their ill-gotten gains.

Considering the public policy behind the Consent Decree and the elements required to justify modification of it, we find that the "changed circumstances" do not warrant a modification. The Consent Decree was the culmination of litigation based on URT's previous employees' wrongful actions that led to IncidentClear's unfair

advantage in a prior bidding process with MassDOT. To make reparations for their conduct, the Defendants agreed to refrain from competing with the United Companies in various ways, including by being enjoined from bidding on additional contracts with MassDOT for a period of five years. The fact that the Debtors filed for bankruptcy and were purchased by Medley does not subvert the purpose of the injunction, which is to balance IncidentClear's previous wrongdoings by preventing it from furthering its ill-gotten gains. Furthermore, compliance with the Consent Decree is not substantially more onerous, regardless of IncidentClear's arguments that the United Companies are no longer in existence. And maintaining the status quo is not detrimental to the public interest, despite IncidentClear's plea that allowing it to bid promotes competition and ensures job security for its employees.

IncidentClear also argues that neither Pat's Towing nor Export were sold as a going concern and that Medley, URT United, URT Pat's Towing and URT Export did not keep Pat's Towing or Export as operating entities. IncidentClear claims that there is a distinction between a sale of the entities themselves and a sale of their bankruptcy estates and assets; the Consent Decree supposedly does not refer to the latter. According to IncidentClear, if the injunction provisions were to apply to the sale of the bankruptcy estates of Pat's Towing and Export, the Consent Decree would have stated so. It contends that there is no justifiable reason to keep the injunction for the benefit of the new corporations who purchased the assets from the bankruptcy estates of insolvent parties who went out of business. While this is a reasonable argument for

IncidentClear to make, the purpose of the injunction remains unscathed, as discussed above, because the injunction was meant to repair the harm that IncidentClear caused and prevent it from further gains for a period of time.  Furthermore, Respondents stated that Pat's Towing and Export were, in fact, sold as going concerns. IncidentClear failed to respond to that statement of fact, but argues against it in its Reply brief.  At the very least, the parties dispute a material fact, which precludes summary judgment.  Moreover, a reasonable jury can find in favor of Respondents. The bankruptcy filing and subsequent sale of the Debtors' assets does not warrant a modification of the Consent Decree.

## II.    Contingent Sale Provision

IncidentClear next argues that Export and Pat's Towing were sold to "outside parties" URT United[1] and Medley, thereby triggering the Contingent Sale exception in the Consent Decree and dissolving the injunction.   The Contingent Sale provision states as follows:

> [I]n the event URT sells both Export and Pat's Towing, Inc. *to an outside party unrelated to the United Companies* during the Restricted Period (the "Contingent Sale"), then the restrictions above with respect to Defendants and the Restricted Group performing work for or bidding on MassDOT work covered by the Existing [IncidentClear] MassDOT Contracts after a Contingent Sale shall no longer apply on and after the effective date of such a Contingent Sale for the remaining part of the Restricted Period. (emphasis added)

---

[1] While both IncidentClear and Respondents discuss URT United and whether it fits into the definition of "United Companies," the sole Purchaser of the Debtors' assets was Medley.  The Court thus focuses on whether Medley was an outside party purchaser, but entertained both parties' arguments regarding Medley's relationship with URT United.

The "United Companies" are defined as "URT, its subsidiaries, affiliates, and their successors or assigns, including its wholly-owned subsidiary [Export]."

First, IncidentClear claims that, in order for Medley to be included as a "United Company," it must be engaged in the "Business" as defined in the Consent Decree. This is not true. IncidentClear gravely misquotes the Consent Decree when it incorporates the definition of "Business" into the definition of "United Companies." The Consent Decree, in actuality, states that the injunction prohibits:

> (a) engaging in any activity within the State of Massachusetts in competition with URT, its subsidiaries, affiliates, and their successors or assigns, including its wholly-owned subsidiary [Export] (collectively, the "United Companies"), in the "Business" where "Business" includes the business of…

The Consent Decree does not require an entity to be in the Business in order to be deemed a United Company. The phrase "in the Business" pertains to the type of activity that the parties are enjoined from engaging in competition with the United Companies. It is therefore irrelevant whether Medley operates "in the Business" for purposes of determining whether it is related to the United Companies.

Both parties agree that Medley is not a successor or assignee of the Debtors. This was already established when the Bankruptcy Court found that (1) the transactions under the APA did not amount to a consolidation, merger, or de facto merger of Medley and the Debtors; (2) there was no substantial continuity between Medley and the Debtors; (3) there was no continuity of enterprise between the Debtors and Medley; (4) Medley was not a mere continuation of the Debtors or their

estates; and (5) Medley was not a successor or assignee of the Debtors or their estates for any purpose, including but not limited to under any federal, state or local statute or common law

Next, IncidentClear argues that Medley was not an affiliate of URT and thus was not related to the United Companies as defined in the Consent Decree. The Consent Decree does not define the term "affiliate." An affiliate is "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation." Black's Law Dictionary 59 (7th ed. 1999); *Chillmark Partners, LLC v. MTS, Inc.*, 2003 WL 1964408, at *3 (N.D. Ill. 2003). "Under federal securities law, an 'affiliate' is defined by reference to control; one who controls, is controlled by, or is under common control…is an affiliate." *In re Motorola Sec. Litig.*, 644 F.3d 511, 513 (7th Cir. 2011). The Illinois Securities Law of 1953, 815 ILCS 5/1, *et seq.*, states that an "'[a]ffiliate' of, or a person 'affiliated' with, a specified person means a person who, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified."

IncidentClear claims that Medley did not exert control over the United Companies; it did not have any of its agents as officers or directors of URT, URT Holdings, or any of the Debtors, and its control was incidental to its status of the second tier secured lender to the Debtors. Respondents, however, argue that Medley had more control over URT Holdings and its subsidiaries than IncidentClear lets on.

For example, in 2014, Medley acquired 80.2% of all equity (including 65% of the common stock) in URT Holdings, which in turned owned 100% of URT. And although Medley did not have an agent on any of the Debtors' boards of directors, it had the right to elect one. It also had voting rights to control every material corporate action of URT Holdings, URT, and URT's subsidiaries. IncidentClear failed to controvert these facts, which are deemed admitted.

We find that Medley was an affiliate of URT and thus falls within the definition of the "United Companies." Medley owned a large share of equity in URT's parent company, URT Holdings. There is no question that Medley and URT Holdings are affiliated entities. URT Holdings being the direct parent company of URT, it follows that Medley was also an affiliate of URT. IncidentClear's argument that a person's status as a shareholder does not make it an affiliate is inapposite because Medley and URT are both *corporations*, not individuals, an important distinction that *Chillmark Partners, LLC v. MTS, Inc.* discusses. 2003 WL 1964408, at*3–4. More significantly, Respondents have shown that Medley, through its shareholder rights with URT Holdings, had the power to control URT Holdings' subsidiaries, including URT. Again, this control amounts to affiliation.

IncidentClear argues that Medley expressly represented to the Bankruptcy Court that it did not control the Debtors and that it did not control the sale of assets process. As discussed below, however, the assertions made to the Bankruptcy Court regarding Medley's control were limited to Medley's control over the sale process,

21

and not over its control over the Debtors generally. Moreover, the Debtors represented to the Bankruptcy Court that Medley *was* an insider, and the Bankruptcy Court recognized Medley's insider status. Medley is and always has been related to the Debtors through its relationship with URT Holdings and, in turn, URT and its subsidiaries.

Having found that Medley was an affiliate of URT, Medley fits within the definition of "United Companies" in the Consent Decree. The Contingent Sale exception has not been triggered and the injunction remains.

## III.    Judicial and Collateral Estoppel

Lastly, IncidentClear contends that judicial and collateral estoppel bar Respondents from claiming that they are "successors or assigns" or "related to the United Companies."

Judicial estoppel "protect[s] the integrity of the judicial process…by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Jarrad v. CDI Telecomms., Inc.*, 408 F.3d 905, 914 (7th Cir. 2005). Judicial estoppel applies when "(1) a party's position is clearly inconsistent with a position taken earlier; (2) the party prevailed on the basis of the prior position; and (3) the party asserting the inconsistent position would derive an unfair advantage, or impose an unfair detriment on the opposing party if not estopped." *Tucker v. Commander Packaging Ret. Plan for Hourly Emps.*, 2012 WL 4854678, at *2 (N.D. Ill. 2012) (citing *Jarrad*, 408 F.3d at 914–15).

IncidentClear states that the Debtors represented to the Bankruptcy Court through Chesen's declaration that "the Debtors' board of directors included no members who are affiliated with Medley" and that they negotiated the APA with Medley in good faith, without collusion, from arm's-length bargaining positions. The Bankruptcy Court concluded that Medley was not a successor or assign of the Debtors for any purpose. IncidentClear argues that Medley should be judicially estopped from claiming that they are a related party to the United Companies after having convinced the Bankruptcy Court that is was an arms-length purchaser of the Debtors' assets.

IncidentClear fails to mention, however, that the Debtors also represented to the Bankruptcy Court that "Medley is an insider." As Respondents explain, Chesen's declaration was limited to assuring the Bankruptcy Court that Medley did not control the Debtors during the sale process. Chesen declared, "[W]hile Medley is an insider, Medley in no way used its insider status to affect the marketing process, the Auction, or any other aspect of the process leading to the Sale." The Debtors did not assert to the Bankruptcy Court that Medley was unrelated or an outsider. Judicial estoppel does not apply because Respondents are not taking a contrary position in this instance.

Similarly, collateral estoppel does not apply. Issue preclusion attaches if (1) Respondents were a party to a prior action; (2) the issues sought to be precluded are the same as those involved in the prior action; (3) the issue was actually litigated; and (4) the determination of the issue was essential to the final judgment. *Wsol v. Carr*, 2001 WL 1104641, at \*6 (N.D. Ill. 2001). IncidentClear argues that "the issue of

whether Medley was related to the United Companies, already decided by the Bankruptcy Court in the negative, cannot be relitigated here." This recitation of the Bankruptcy Court's conclusion is blatantly false. To the contrary, the Bankruptcy Court unequivocally stated, "I do recognize that [Medley] is a related party." The fact that the Bankruptcy Court ultimately concluded that Medley was an arm's-length purchaser of the Debtors' assets and was not a successor or assignee of the Debtors does not take away from its recognition that Medley was a related party. Respondents are not estopped from arguing that they are a related party. In fact, as IncidentClear itself states, the parties are bound by the decision of the Bankruptcy Court, which determined that Medley was a related party.

## IV.    Attorneys' Fees

Respondents claim that they are entitled to attorneys' fees as the prevailing party under the Consent Decree. Paragraph 18 of the Consent Decree, which governs dispute resolution, instructs the parties to resolve issues amongst themselves and, if unsuccessful, to apply to the Court for appropriate relief. If an action ensues, the prevailing party "shall be entitled to collect reasonable expenses incurred, including but not limited to reasonable attorneys' fees." Paragraph 18, however, relates to non-compliance with the Consent Decree:

> In the event that either party to this Consent Decree believes that the other party has failed to comply with any material provision(s) of the Consent Decree, the complaining party shall notify the other party or parties of the alleged non-compliance, and shall afford the alleged non-complying part(ies) ten (10) business days to remedy the

non-compliance, or to satisfy the complaining party that compliance has actually occurred.

There was no accusation of non-compliance here. IncidentClear brought its Petition seeking a declaration from the Court as to whether or not it can bid on the upcoming MassDOT contracts. Respondents contend that they explained to IncidentClear that the relief it sought was unwarranted in an attempt to avoid the costs and fees of litigation. Paragraph 18, however, does not apply in this situation. Despite being the prevailing party, Respondents are not entitled to attorneys' fees under Paragraph 18 of the Consent Decree.

## CONCLUSION

For the foregoing reasons, IncidentClear's motion for summary judgment is denied. The Consent Decree remains unchanged and IncidentClear is enjoined from bidding on the upcoming MassDOT contracts. Respondents' request for attorneys' fees is also denied. It is so ordered.

Dated: 8/9/2018

Charles P. Kocoras
United States District Judge